Good morning. May it please the Court. My name is Josh Richards for Defendants' Appellants. I'd like to reserve three minutes for rebuttal, please. This case is fundamentally, from our perspective, about an educational institution's First Amendment right to speak about issues of racism on campus. This appeal primarily considers the District Court's erroneous conclusion that the common interest privilege that the university enjoys under these circumstances was destroyed because plaintiff appellees purportedly adequately pleaded malice, which the District Court concluded would destroy the privilege. And I really want to focus mostly on the facts in this portion of the argument because I think once the facts come into clarity, the law sort of falls into place. And there are a few places where I think we disagree with our friends across the aisle on the law, but I think mostly it's fairly aligned. The most important facts to consider here are that a few days after this incident and one day after the university made its first statement about these issues, the students at issue sent a letter to the administration in which they said that a few of the costumes they wore were perceived as racially insensitive, that they dressed in such a way that when looked at in a photograph came across as blackface. They said even though they intended them as beards, they accepted the harm that they had caused and had acted from a place of ignorance. So let me ask you this. According to the facts as alleged in their complaint, it indicates that or alleges that on January 26, 2020, Coach Day is informed by Kuntz that the unidentified CLU staff member complained to Defendant Kimball that the softball team had posted the blackface. That's my understanding of what's in their complaint. And then in addition, the next thing that occurs is that on February 5, the email goes out indicating that at no time prior to the email, the Defendant Kimball attempted to perform any direct investigation into the matter. So my question to you is why isn't that enough if they've alleged that information in their complaint to indicate that there was no investigation? How would they conclude that, in fact, it was blackface at that point? So, I mean, there are a few points on that. I think the most important point is that what the cases show us is that a reasonable belief in the truth is sufficient so long as the speaker is speaking on a topic of mutual interest. So what was that reasonable belief supported by prior to February 5? Well, there are a number of defendants who have been named, right? And if you listen to the recordings, in particular, that the plaintiffs have placed in the record as part of their complaint, it's clear that Kimball worked with others in putting together the statement. And so we know, based on the allegations of the complaint, that Kimball wasn't the only one who was involved in crafting this statement. So I think you can surmise, based on that, that at a minimum someone involved had viewed it. But backing up, what we had was a complaint from a member of the community that a blackface video had been posted. But you started your argument by saying that the facts were important, so I want to get to those facts. The facts, as alleged in the complaint, indicate that the email was sent out on February 5. My question to you is what facts support a reasonable belief that at that point, prior to February 5, that that statement was accurate? Well, first of all, a complaint had been lodged that said this was a blackface video. So certainly, I don't think we... So any allegation that the school receives about blackface, you're going to immediately send out an email saying, by the way, blackface, are you going to do that? No. So tell me what facts support that. Well, Your Honor, as I've said, we already know that there was more than one person involved in addition to Kimball. And so I don't think it's a reasonable supposition to say that just because Kimball hadn't viewed the video on the 5th, that means that nobody had. Correct? Correct. Number two. But the question is, they've alleged this, right? They've alleged this in their complaint. And if they've alleged it in their complaint, there's some dispute about that. So two points. I don't think that an allegation in their complaint, taken out of context of the rest of their complaint, is entitled to a presumption of truth. So I think they can state conclusions in their complaint, which, if they conflict with other allegations that are in the record, aren't entitled to the presumption of truth. So that's one. Two, and I recognize that Your Honor is focusing on the facts here, but again, Well, counsel, you told me that that's where we needed to start at, and I think that's where we do need to start at, those facts. I agree, Your Honor. I agree that the facts are incredibly important here. But I want to place those facts in the context of the law that we're talking about as well, which is that it is not required under the case law that the statement made be true if the statement is made in furtherance of the common interest privilege and the topic that's being discussed within the group. And so while I would concede that it is an important consideration, I don't think it's the only consideration. Can I ask this? I was having a hard time understanding what exactly is being alleged as defamatory. And I was curious as to why the parties didn't engage in more discussion of whether this was an actionable, factual assertion or an opinion-based one. Because if some of this is a racist incident, there are plenty of cases that suggest that that's just non-actionable opinion. If we're talking about blackface, as I understand it, there seems to be two competing definitions between the parties as to what constitutes blackface. Is that an actionable, defamatory statement, or really as a statement of fact that can be provable or disproven? I don't think it is, Your Honor. But I will concede that the first time that I saw plaintiff appellees boil their complaint in this case down, their allegation of what was defamatory to a colonel was in their opposition brief here in the Court of Appeals in which they state, I think in the opening paragraph, that the defamatory matter was the use of the words racist blackface. Now, I don't think that sort of concession was made below. But don't we have to be specific about what exactly is being expressed here? Because racist incident is one expression, and then another one in the emails is that many people perceive this to be blackface. And either that's factually provable because many people did, or it's a statement of opinion insofar as, you know, whether someone thinks that an exaggerated expression of black culture is a provable fact or otherwise. I was having a bit of a hard time wrapping my arms around whether this is a factual defamatory issue. I agree, Your Honor, that based on the way that this case has been framed in this court, it is not. That issue wasn't briefed before the district court. So, but I think, though, getting back to the facts. Well, how significant was the email from the team members in Kimball's decision and the decision of the defendants? Well, so there's a lot wrapped up there, and it does get back to the facts, right? Because what it gets back to is this issue of whether something that's not intended to be racist can be racist. And Kimball repeatedly makes a distinction. In all of the university's communications, they make a distinction. The distinction is that the impact of an act is different than the intent of the act. And none of the communications in this case talk about players' intent. They all talk about the thing itself. And the thing itself, you'll remember, isn't the performance, which if the entire campus were there to see it, we might be in a different position. It was the posting of the performance on social media in such a way that everyone agrees that when you looked at it, it came across as blackface. So what we're talking about here is now that we have this thing out in the ether, which, good intentions or bad, looks how it looks, what can a university do to talk about that? Now, the university doesn't need to talk about the players individually, and it didn't. It doesn't even need to talk about the team, and it didn't. All it says is, California Lutheran students. And it only does that twice. Otherwise, the statements talk about the impact of the thing itself on the community. And respectfully, what are colleges and universities supposed to do here? Now, because I agree with you that it's a proper kind of discussion to be had at universities. I commend the school for engaging that. But I have to go back to the first point, which is your point, frankly, going back to the facts. I go back to the email indicating two racist incidents and racist incidents involving social media posts. Now, this goes to Sanchez's comment that just saying racism, that's not enough, and the case law sort of establishes that. But this goes on further, though. This email then says that blackface and the n-word invoke white supremacy, anti-blackness, et cetera, et cetera. So this is different than just saying racist comments were made. This actually specifies the kind of racist, the specific kind of racist, the blackface. So that's – isn't that different? And so it goes to the question then to you again. What information makes the issuing of that statement reasonable? I think – well, there's two points. First, again, it's reasonable because a complaint was made alleging that a blackface performance was posted. There's two, it is not a plausible inference that Kimball was the only person on campus involved in this matter. The president of the institution is the only person at the university who has any say in a statement being released. That's not plausible, Your Honor. And three, there's information in the record affirmatively that others were involved. So we're supposed to surmise that that's the case? We're supposed to – Well, under Iqbal, we don't surmise. We use our life experience to draw conclusions. And the conclusion that my life experience causes me to draw is not that a mere allegation that Kimball hadn't seen the video on the 5th means that nobody involved in the university's response had. I don't think that's a plausible conclusion, Your Honor. And again, I don't think it's necessary for the university to prevail here because, again, in a post-hoc world, we know that everybody thinks it was blackface. I mean the complaint also discusses some sort of outrage after the social media post was alleged. So it wasn't as if it wasn't getting discussed in the student body as well, was it? No, and that's the critical thing here. So if the university is responding to that, I don't know if it's that hard to draw some connection between that and the university's initial email as to what may have happened. Maybe the university was a little bit too quick to label – slap on a label of racist without getting deeper into the details of it. I see that my time is running for my rebuttal. May I rest then? Let me ask you one question here. Do you think that the university officials were sort of using this as a teachable moment in some respect? Well, that's exactly what I was just going to say, Judge Jackson. I mean this is something that the university has an obligation to talk about. And, you know, there are two conversations that are happening. One conversation is certainly the conversation that's happening with the team itself. But that's a separate conversation from the conversation that's happening with the community. And if somebody were to burn a cross on campus, whether they meant it as racist or not, you better believe that the university would talk about that with its students, whether or not the campus knew who had burned the cross or hadn't. And what you need to ask yourself is, what would a university have done differently here? Well, we didn't name the students. We didn't name the team. So how do we facilitate a conversation about the thing itself, the video that everybody agrees comes across as blackface in a narrower way? I would submit to you it's not reasonable to ask a university to do that. And I would also ask you to think about the scope of the common interest privilege. It's a flexible privilege. We know from the California state cases that the way the courts have interpreted that is to look at the defamation versus the First Amendment right and gauge under the circumstances where that balance should be. I would say to you that the First Amendment right in the context of a university talking about racism on campus is at its apex. And that we are interpreting the common interest privilege at the broadest possible place that it can be interpreted. Good morning, Your Honors. My name is Michael Saltz. May it please the court, I represent the 24 members of the 2020 California Lutheran University softball team and its three coaches, all of whom have had their lives forever altered as a result of the events that occurred that are at the heart of this case. I'd like to start by answering some of Justice Sanchez's questions because, as Justice Mendoza pointed out, we're limited to the facts of what has been alleged and not what has been argued to be in the complaint which doesn't exist. In this particular instance, I will work backwards and address the question with regard to is this merely statements of opinion. If this were statements of opinion, we wouldn't be here. If the e-mails had said some have perceived that something occurred that was blackface, that was not. Because let's not forget that it is alleged, and I know there's a lot of facts here, sometimes it's hard to follow the timeline. Well, can we be more specific? Are you alleging that the phrase racist incident is defamatory? In a particular instance with regard to the February 10th e-mail, absolutely. February 5th. To the extent that they said that the definition that they used required that the team actually have the intent to portray black people and black culture in a comedic fashion and to cover their faces with makeup. Factually false on every turn. Not to mention the fact that they did not receive complaints from the student body. What is alleged. Counsel, I think he was referring, he was trying to direct you to February 5th e-mail. February 5th e-mail confirms that a blackface event occurred. It doesn't say that a blackface was alleged to have occurred. It doesn't say that we've received a complaint that a blackface event had occurred. They specifically said two events occurred last week where students posted racist events to social media and that's not what happened. So if we follow the timeline. But if two racist incidents, so if two racist incidents involving social media posts, are you saying that is factual, that's a factual assertion? Had they left it there, it would have been ambiguous. It wouldn't have referred to anybody. But it's a follow-up, the blackface and the N-word evoke white supremacy. That you say is, in essence, you're saying that that essentially calls the performance blackface. Correct. So let me ask you this. I want to get away from the semantics here. The team itself in its e-mails, in its e-mail, admitted that the video was problematic, correct? They were. Yes and no, counsel. No, they did not admit that it was. They did not admit that they posted an e-mail that could be perceived as, and I'm going to use my word, racially insensitive at least. I won't even use the R-word, the racist word. No, what they said was they could see how people could see it as racially insensitive. So what's the significance of them at least admitting to that? It suggests to me that they themselves believe that, wow, this could be perceived, and you admit it, that this could be perceived as racially insensitive. There's a problem here. Because they were scared. And if they didn't think there was a problem here, they would not have sent the e-mail on their own, right? Because they were scared for their lives, Your Honor. The February 5th e-mail had already come out. They did not understand that the timeline is that the event occurred where there was a lip-sync contest. The girls wore Napoleon Dynamite wigs. They wore facial hair. No one had covered their faces in order to portray any particular culture, only a gender. My point is that they themselves, it seems to me at least, identified the incident as an incident that could be racially charged, even if it was misunderstood, even if those who viewed this video were mistaken with respect to their intent in producing the video. I think that you're going down a particular path where later in there they said, we didn't do this. That particular letter, the apology letter, said we did not do blackface. We did not do this. To the extent that they performed the Fresh Prince of Bel-Air, they were told that was racially insensitive. Because Kimball, as alleged in here, said that white people don't have the right to perform or black artists. And that also came out with regard to his statement when they were in the chapel. And it was brought up that one of the administrators dressed like Bob Marley. And he said as a white male, he does not have that right to do so. You have to understand that when they were questioned in January, they said they did not do anything wrong. They specifically told the administration there was no blackface. The administration took that and knew that there was no blackface. There was no discipline as a result of it. There was no cancellation of the Texas. Let me ask this. Walk me through your view as to why plaintiffs have plausibly alleged actual malice to defeat the common interest privilege. As I see the Kimball statements in that meeting before the February 10th and the dichotomy between intent and effect. I know in my heart that you guys didn't intend for this to happen. But it did. He later goes on to say it was blackface. And there's a difference of opinion about that. If he said that there's a difference of an opinion, that would be one thing except for the fact that. But why does that indicate either bad faith or knowledge that he knows it to be untrue? Well, let's go back to the fact that his administration, his people who did the investigation prior to had determined that it wasn't blackface. They determined that it was just lighting seen on a phone. And there was only a complaint by one person in the administration, which also answers the question. But that's plaintiff's definition of blackface. And look, I'm not going to step in and define it for you guys one way or the other. But at the same time, the university is taking on a different definition, a broader one. But why does that indicate that Kimball at least believed that his statements were false or had reason to think so? Because the girls had expressly showed him pictures that it was facial hair, blonde hair. They had already investigated that there was no intent to portray black people or black culture in a comedic fashion. They had under any definition that the university had satisfied itself that there had been. All that relates to are how the team members viewed it, not how Kimball himself is viewing it. That's the actual malice pieces. He knew one thing but said something else. And I'm not hearing what that is. Kimball said curly wigs and hip hop dress. That's what he said was his definition of blackface on that recording. And that's when the parents erupted and said, we have curly hair. And as we pointed out, the most famous hip hop artist of all time is Eminem, who is white. The most famous hip hop artist of all time is Eminem? The most successful, if you look it up, I swear to you, Your Honor. I think Jay-Z might say something else. Because of the amount of records sold and the money generated. Counselor, I think you're going to lose that argument. I was surprised when I did the research for this case that that is a fact and our expert had actually pointed out. We'll just note that you're an Eminem fan. I'm a Michael Jackson fan. And that's how I grew up was with Michael Jackson. But I was shocked. And so at least they didn't say he was the king of pop. In that regard, there are a number of things that are incorrect. And we point out that they had misrepresented the facts at every turn. And if I may address them, number one, they didn't say that this was an opinion. They didn't say that some perceived it as. They didn't say that they were still investigating as to whether it was. Counselor, your evidence of malice is the absence of key phrases in the statement. Is that what you're suggesting? Well, understand that it's a lie that they got so many complaints. There was a member of the administration, as alleged, that saw it. The Black Student Union wrote a letter saying we didn't even know about this until you guys published your e-mail. The article has a student that was interviewed that says we never heard about this. No one was talking about this until the February 5th e-mail. The first mover in the conversation was the university on the blackface issue. So that is a misnomer that I wanted to address with your honor. The Black Student Union confirmed that they never heard about it. It was in writing and it's alleged in here. So it was an actual lie in the February 10th e-mail that they said they received numerous complaints about it. The fact that someone doesn't know that a racist statement was made or a racist act was done, I don't understand how that factors in to the fact that the statement was in fact racist or the statement could be or the act could be racist. Well, to begin, even the defendants haven't stated that there's truth to their statements. Their motion is not about that. Their motion is about even if it's not true. And I guess to put it another way, are you suggesting that the university officials had no obligation to say anything unless and until someone complained? So, again, you're running into FERPA issues. So when a university speaks, it has limitations. It doesn't have unfettered First Amendment rights. But there was nothing that identified any particular student or personal information. Well, if you believe the university, everybody saw who it was. They saw the picture of it. So a link can be made. And they specifically cited the CFRs. It feels like you're running across purposes because if a moment ago you said the university initiated all this, but now everyone can see from the social media, which is it? Either everyone knows about it or the university spearheaded this whole thing. That was the dilemma. As I said, their motion is not based upon the facts as alleged. Their motion is based upon the facts as they wish you to believe them to be. The facts as alleged are that the Black Student Union confirmed that no one was talking about a blackface event. The N-Word incident, which doesn't involve the softball team, everybody was talking about that. That's what brought this on. I don't understand the reliance on the Black Student Union. Suppose a non-African American student saw it and was offended by it. We have that alleged, too. We specifically allege, and under Iqbal and Twombly we're supposed to believe the facts in the complaint to the extent that they are alleged and reasonable inferences can be drawn. We said that no one saw it. We said the Instagram count was barely the number of players and their families who saw it. So we know that it wasn't widely spread or viewed because Instagram had that at the time that it was taken down. Counsel, I want to go back to Judge Sanchez's question, which is the allegation of malice and your belief that there was actual malice here, and that is based upon what? The viewing of the pictures by Iqbal and Doherty and that they had confirmed with the team that it was makeup, that there was no makeup on their face, but that there was the beard. Right. There were goatees. Okay. That's obviously not going to be mistaken. What else, Counsel, aside from those two things, indicate that there was actual malice? Well, there's two very specific things. The investigation that confirmed that they did not put on blackface, as was defined by the 20 dictionary definitions and not the perverted definition that we pointed out, which was they used the definition of minstrelsy, which includes blackface as part of it, and we pointed out exactly where they got their definition from. It's not a definition of blackface. So the intentional perversion of the definition to meet their needs, the fact that the university had already performed the January investigation and determined by looking at the pictures that the girls did not cover their faces in order to portray anybody of any particular race. But can I go back to the perversion of the definition? Yes. Is the allegation that Kimball or other officials had read these other dictionary definitions and knew what their true definition of blackface was but nevertheless stuck to this strange quasi-definition of blackface that's really about minstrels? Minstrelsy. Minstrelsy was a type of minstrelsy. No, I know what it is. I'm asking is your allegation that Kimball knew these other definitions but stuck to his own? Oh, no. He invented it after the meeting. The allegation is that for the February 10th email, they tried to, after being yelled at by the parents and after saying, what about the wigs? I mean, that's what he said. When the parents said, that's not blackface. You want to say someone is dressing up? If it was blackface at the meeting, then how is it plausible that he invented it after the meeting? He did not say. He did. I've read the complaint. I understand. When questioned, he said that what he saw was the girls wearing male facial hair. And what he saw. And then the parents said, that's not blackface. And then he said, what about the wigs? The blonde wigs. What about the blonde wigs? And the way they were dressed. So what he was saying was, it's blackface to wear a Napoleon Dynamite wig and to dress in the fashion of hip hop. And that is something entirely different. He put a label on it that actually has definitions. And we gave you plenty. He put a label on it that is not that. It already has a label. If you want to say someone is. Counsel, from the complaint, ER 141, Defendant Kimball claims that what they did was blackface. Correct. Defendant Kimball claims that there are different definitions for blackface for some people alluding to the use of a wig or dressing in hip hop clothing than the parents erupted uniformly in disagreement. Correct. So I guess I'm having a hard time seeing how he invented this after the fact when this was discussed at the meeting. Because the definition then changed in the February 10 email where they then go and say, oh, no, it is putting makeup on the face and portraying black people and black culture. It says that if they still say in that email, many viewers in our campus community took offense and identified it as blackface. First of all, not many viewers, as we just discussed. It is alleged that very few people saw it and were only aware of one person in the administration that pointed it out. While some have questioned the university's use of the term blackface, which was the team and the parents, and whether such a definition is solely limited to using makeup on one's face, the university used the term as it is often used by historians. No, this is not the term as often used by historians. Comedic performances of blackface by whites in exaggerated costumes and makeup, regardless of how one views this particular definition, it does not change the nature of the underlying conduct. The conduct was he said in his heart he did not believe it to be racist. Here he says that the makeup and the costumes were done with the intent to be racist, to make fun of a culture. You're running a little bit over, but let me ask a question about you made an argument about this case, Haron, and whether the privilege even applies. And I think the brief your brief makes the assertion that if you have if you release this to the press and it's not subject to the privilege. Right. But let me ask this, because the communications themselves were to the community. And in Haron, as I read that case, the alleged defamatory statement was a press release to the public at large. And I see those as being two different things. Tell me. Tell me why. If you disagree. Because Kimball is quoted in the articles where they released the information as it was his intent that everybody know about it and that they call out people who do things that they don't like. And we have the article in there and the quote from it. But the article. But, you know, there are cases that if even if you have a privileged communication, if it gets released to the media after the fact, doesn't defeat the privilege. Why aren't we in that situation? Because you exceed the group for the purposes of the group, as Harwin specifically stated. And I know the particular provision of which you speak. Harwin doesn't say that it's automatic with regard to the media, but it loses its common interest privilege aspect if it's overly done. With regard to that quote, I have it here for you. So if you communicate to the community, that's OK. But if they speak to the press, then it's overly done. Is that what you're reading of it? Yeah, it's it's a little bit more nuanced than that. If you know that you're saying false things to your community, then know that you're out the window no matter what. But if you have a reasonable belief that what you're saying is true, you lose the qualified interest privilege if you if it goes beyond. And what what Harwin versus Hickson said at page 288 is the accompanying press release. One of several alternate and optional methods of disclosure to the public is not mandatory. So they were looking to see, is this mandatory with regard to their disclosure? And they concluded, no, it wasn't mandatory. So that worked against the privilege. And then they said, in our view, defeats the privileges purpose. And the privileges purpose is to make sure that only those members who are interested in that communication are part of the communication. And what Harwin said was, if you're going to just talk to everybody. And then, no, you lose the fact that you're only talking to the interested person. Now you're talking to people who are not interested. And the quote from Kimball. When he released the information was that they wanted everyone to know, and that was a quote in a newspaper article. Is there anything else you wanted to add before you wrap it up? Unless you want me to address any of the other issues on the false light or the UCL. I understand that on the compensation issue, it's also alleged, and it's not raised in the appellant's brief, that she claimed to have had to spend legal fees with regard to defending herself in the investigation. So that is a loss of property or money. She also had her Texas trip, which was canceled, which also deprived her of the extra compensation that they're paid when they go on their trips. So if you don't have any further questions, Your Honor, thank you. Thank you. Mr. Richards, you went over, but we'll give you a minute. I will be less than a minute, if possible. Counsel repeatedly used the word intent, that the university said that they intended to do these things. The college never said that. That's not in any of the statements. Intent was never part of this. What I'd like to conclude with is I think even though the anti-SLAPP statute doesn't directly impact the way that the court will interpret defamation law, I do think it's important to think about the context of this case. The university made a statement of broad public interest and specific public interest on its campus, and the response was to file a lawsuit seeking $100 million in damages. If that won't chill colleges and universities from talking about racial issues on campus, I have no idea what will. Thank you. Thank you. Thank you, counsel, for your arguments. The matter will stand submitted and court is adjourned. All rise. All rise. This court for this session stands adjourned.
judges: SANCHEZ, MENDOZA, Jackson